UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------

APPLICATION FOR A SEARCH OF THE
PREMISES KNOWN AND DESCRIBED AS
UNIT #523 AT PARK CIRCLE STORAGE,
348 CONEY ISLAND AVENUE,
BROOKLYN, NY 11238, AND ANY CLOSED
CONTAINERS/ITEMS CONTAINED
THEREIN

-------------------------------------------

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH AND
SEIZURE WARRANT**

No. 21-MJ-1213

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, JUSTIN KONG, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with Homeland Security Investigations ("HSI"). As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Special Agent since 2017 and am currently assigned to the Darkweb and Cryptocurrency Taskforce at HSI's New York Office, where I have served for approximately two years. During my tenure with HSI, I have participated in investigations into criminal offenses involving darkweb vendors using darkweb marketplaces to sell and distribute contraband, and am familiar with the means and methods used to commit such offenses. During the course of these investigations, I have participated in the execution of search warrants involving residences, storage units, safety deposit boxes at financial institutions, and emails and other forms of electronic evidence.

2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for, and to seize, the items and information described in Attachments A and B. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my

conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### THE SUBJECT PREMISES

3.      Based on my observations of the exterior of the Subject Premises on or about October 18, 2021, I am aware that the Subject Premises is particularly described as Unit #523 at Park Circle Storage, 348 Coney Island Avenue, Brooklyn, NY 11238. The Subject Premises is located inside a five-story building ("Building-1") on Coney Island Avenue between Caton Place and Kermit Place, bearing a green sign with white lettering that states, among other things, "Park Circle Storage." The Subject Premises is located inside Building-1 behind a grey corrugated metal door (the "Entrance"). The number "523" appears in black font above the Entrance. A photograph of the Subject Premises appears in Attachment A.

### THE SUBJECT OFFENSES

4.      For the reasons detailed below, there is probable cause to believe that the Subject Premises contains evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute cocaine) and Title 18, United States Code, Section 924(c) (possessing a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses").

## PROBABLE CAUSE

### A.  Probable Cause Regarding Commission of the Subject Offenses

5.      On or about October 5, 2021, the Honorable Katharine H. Parker, United States Magistrate Judge, Southern District of New York, signed a complaint, pursuant to a sworn affidavit, charging KAREEM HASSAN ("HASSAN"), STEVEN HERRERA ("HERRERA"), and WAEL HAMAD ("HAMAD," or together with HASSAN and HERRERA, the "Defendants") with narcotics conspiracy, in violation of Title 21, United States Code, Section 846, at which time Judge Parker also issued arrest warrants for HASSAN, HERRERA, and HAMAD. A copy of the Complaint is attached hereto as Exhibit 1 and incorporated by reference as if fully set forth herein.

6.      As set forth in the Complaint, from at least March 2021 to the present, the Defendants conspired with others known and unknown to sell cocaine on two marketplaces on the darkweb. The Defendants shipped cocaine to customers of the marketplaces by mailing packages in various United States Post Offices. During the investigation, law enforcement agents conducted several undercover purchases of cocaine from the marketplaces and seized those packages after they were mailed. Ex. 1 ¶¶ 5, 9-19.

### B.  Probable Cause Justifying Search of the Subject Premises

#### Searches of 71J Apartment and the Manhattan Storage Unit

7.      On or about October 5, 2021, Judge Parker signed a search and seizure warrant for, among other locations, 225 Cherry Street, Apt. 71J, Manhattan, New York, 10002 (the "71J Apartment") (the "71J Apartment Warrant").

8.      Based on my participation in the investigation, I know that, on or about October 8, 2021, law enforcement agents (i) arrested HASSAN and HAMAD inside the 71J Apartment, and (ii) executed the 71J Apartment Warrant, at which time law enforcement agents identified, among other things:

a.   One small safe (the "Small Safe") inside a closet, containing what appeared to be approximately one-quarter to one-half of a kilogram of a white powdery substance, which, based on my training and experience, appeared to be cocaine.

b.   One large safe (the "Large Safe") inside a closet, containing what appeared to be a significant amount of jewelry, approximately $140,000 and external hard drives.

c.   Keys to a storage unit, subsequently determined to be a particular storage unit in Manhattan (the "Manhattan Storage Unit") on a desk.

d.   Additional narcotics-related items including (i) a money counter; (ii) approximately 30 sealed, packaged U.S. postal parcels which were ready to be mailed; (iii) approximately 70 unsealed envelopes which listed the narcotics order on the upper portion of the envelope, such as "30 phent," which, based on my training and experience, I believe refers to fentanyl; (iv) approximately eight or nine boxes of unused U.S. postal service mailing envelopes; (v) miscellaneous pills; and (vi) four bricks of an unknown substance, which were wrapped in concealment, which, based on my training and experience, I believe to be narcotics. Based on my participation in this investigation and my training and experience, I believe that HASSAN and HAMAD were packaging and mailing orders placed on the darkweb from the 71J Apartment.

9.     On or about October 8, 2021, Judge Parker signed a search and seizure warrant for the Manhattan Storage Unit (the "Manhattan Storage Unit Warrant").

10.     Based on my participation in the investigation, I know that, on or about October 8, 2021, law enforcement agents executed the Manhattan Storage Unit Warrant, at which time law enforcement agents identified, among other things:

a.     A 9mm SCCY Industries firearm;

b.     Around 60 rounds of 9mm ammunition; and

4

      a.   More than twenty empty prescription pill bottles with pharmacy-grade labels on them, containing residue.

11.    As set forth in further detail in the Complaint, prior to the arrests of HASSAN and HAMAD or the execution of the 71J Apartment Warrant, law enforcement agents seized a package from a post office which listed HERRERA as the sender on or about April 20, 2021. Inside the package, law enforcement agents found a jump starter for a car, and inside the jump starter was a cellphone (the "Cellphone"), which contained, among other things, emails for a particular email account (the "Email Account") containing bills from Manhattan Mini Storage (i.e., the same storage company where the Manhattan Storage Unit is located) addressed to HERRERA. Based on my training and experience, I know that narcotics traffickers often ship narcotics through the mail in covert packaging, and, after receiving the narcotics, narcotics traffickers ship back the covert packaging. When returning the covert packaging, narcotics traffickers often include a cellphone so that the narcotics traffickers can track the location of the shipment. Ex. 1 ¶ 13.

Search of the Subject Premises

12.    Based on my review of HAMAD's cellphone, which was seized and searched pursuant to the 71J Warrant, I am aware of the following, among other things:

      a.   The account for the Email Address—i.e., the same Email Address that appears on the Cellphone—is populated on HAMAD's cellphone, and includes the email described below:

            i.   On or about September 22, 2021, a representative of the storage unit company (the "Brooklyn Storage Facility") located inside Building-1 that manages the Subject Premises sent an email (the "Email") to the Email Address to the attention of "Mr. Herrera."

        ii.      The Brooklyn Storage Facility representative stated, in substance and in part, that as of on or about September 22, 2021, there was a balance of approximately $593 on the account of "Mr. Herrera."

13.    Based on my participation in this investigation, including my conversations with another law enforcement officer who participated telephonically in the post-arrest interview of HERRERA described below, I am aware of the following, in substance and in part:

    b.    On or about October 8, 2021, law enforcement agents arrested HERRERA in Texas on the basis of the arrest warrant issued by Judge Parker on October 5, 2021. After HERRERA was advised of and waived his *Miranda* rights, HERRERA stated the following, in substance and in part:

        i.      Several years ago, HERRERA provided HAMAD with a copy of HERRERA's ID.  Afterwards, HERRERA received a letter from a collection agency about a missing payment for a storage unit. HERRERA called the collection agency and learned, for the first time, that a unit had been rented in HERRERA's name. HERRERA thereafter confronted HAMAD and HASSAN, but HAMAD and HASSAN responded that HERRERA should not worry, and HAMAD stated that HASSAN had opened the account in HERRERA's name.

        ii.      HERRERA was unaware of any other storage units in HERRERA's name.

        iii.     HAMAD discussed using a gun for personal protection in HERRERA's presence.

14.    Based on my communications with a representative of the Brooklyn Storage Facility, as well as documents and records provided by the Brooklyn Storage Facility, I am aware of the following:

a.      On or about January 15, 2019, an application for the Subject Premises was submitted in the name of "Steven Herrara" (HERRERA's name, but for the inclusion of an "a" rather than an "e" before the last two letters of HERRERA's last name). This application listed an email address other than the Email Address.

b.      On or about September 29, 2020, a re-application for the Subject Premises was submitted in the name of "Steven Herrera," which listed the Email Address. The Brooklyn Storage Facility maintained a copy of the New York State driver license for "Steven Herrera," which I have reviewed, and based on my participation in this investigation, including my review of New York State Department of Motor Vehicle records, I believe that the individual depicted in the photograph is HERRERA and that the driver license is HERRERA's actual New York State driver license.

c.      The last reoccurring credit card payment of approximately $275 for the Subject Premises from "Steven Herrera" occurred on or about July 20, 2021, and the Brooklyn Storage Facility still lists "Steven Herrera" as a "current" tenant.

d.      Accordingly, I believe that the Subject Premises were opened in HERRERA's name, likely by HASSAN and/or HAMAD.

15.    Based on my training and experience, my participation in this and other investigations involving drug trafficking, and conversations with other law enforcement officers, I know that:

a.      Individuals who traffic in controlled substances unlawfully, including those who maintain multiple premises for use in their drug trafficking operation, typically maintain books, records, receipts, notes, ledgers, money, money orders, money counters, bank records, currency, safe deposit box keys, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled

7

substances in separate, off-site storage facilities, like the Subject Premises. Records and documents and electronic devices frequently are maintained in these locations on a continuing basis and for long periods. It is also common practice for drug traffickers to utilize safes within the storage facilities to safeguard and facilitate the concealment of the above-described items.

b.      Individuals who dispense and traffic in controlled substances unlawfully routinely conceal in off-site storage facilities large quantities of currency, financial instruments, precious metals, jewelry, and other items of value, which can constitute the proceeds of illegal controlled substance transactions.

c.      Individuals who sell narcotics through the mail typically maintain narcotics, often maintain materials to package narcotics and shipping materials in premises that the individuals control, such as off-site storage lockers.

d.      Individual who sell narcotics often possess firearms to protect their narcotics business or to threaten or intimidate others who might interfere in their narcotics business—for example, law enforcement or competitors. As discussed above, when law enforcement agents searched the Manhattan Storage Unit on or about October 8, 2021, they discovered a firearm and ammunition.

e.      Individuals who traffic drugs routinely secrete and store books, records, documents, currency, firearms, ammunition, and other items of the sort described in the preceding paragraphs and in Attachment B, which is incorporated herein by reference, in secure locations like cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items. I therefore seek authorization to open any closed items and containers or to seize any such closed items and containers so that they may be opened if tools or other implements are required.

16.     Based on (i) the fact that the Cellphone, which was likely being used to track shipments in connection with narcotics trafficking, had the same Email Address as the account owner of the Subject Premises; (ii) the Subject Premises and the Manhattan Storage Unit were registered in HERRERA's name, and HERRERA provided HERRERA's ID to HAMAD; (iii) a firearm and ammunition were found inside the Manhattan Storage Unit; (iv) suspected narcotics and a significant amount of apparent narcotics proceeds were found inside the 71J Apartment, in which Hamad and HASSAN resided; and (v) the fact that narcotics traffickers often use storage units to store narcotics and narcotics proceeds as well as firearms and ammunition, I believe that the Subject Premises is being used in furtherance of the Subject Offense.

**C.  Probable Cause Justifying Search of ESI**

17.     Based on my training and experience and my familiarity with this and other drug trafficking investigations in which drugs are sold on the Internet, I know that individuals who sell drugs on the darkweb often use computers to receive and process orders by drugs customers. As described above, the Defendants sold cocaine on two darkweb marketplaces and hard drives were seized from the 71J Apartment. As a result, there is probable cause to believe that the Defendants used electronic devices to manage the marketplaces and receive and process orders by drug customers through the marketplaces.

18.     Based on my conversations with another law enforcement officer who has reviewed U.S. Postal Service records, I am aware that HASSAN has been actively purchasing a substantial quantity of stamps since in or about September 2017, amounting to approximately $205,000 between in or about September 2017 to the present. Based on my participation in this and other investigations, I am aware that individuals who sell narcotics through darkweb marketplaces frequently purchase a large quantity of stamps in order to conceal their identities while sending

narcotics to customers. Accordingly, I believe there is probable cause for law enforcement to search for ESI from on or about September 1, 2017 to present.

19.     Based on my training and experience and my familiarity with this and other drug trafficking investigations, I know that individuals involved in drug trafficking often use cellular telephones to discuss and plan drug sales and to arrange the distribution of drugs and drug sale proceeds. Such individuals use cellphones because, among other reasons, the identity of a cellphone subscriber may be concealed, cellphone numbers are easily changed, and cellphones may be used to send communications using encrypted messaging services and social media applications over the Internet. Similarly, I know that drug traffickers often need to "launder" the proceeds of drugs transactions in the days and weeks following a cash transaction, and traffickers often broker and coordinate this laundering using cellphones. In addition, I know that drug traffickers sometimes use ride-sharing services, such as Lyft, to travel between stash houses and locations where narcotics are sold. Individuals typically book rides through these services by using an application saved to their cellphone. These applications typically store information concerning, among other things, the user's ride history and payment history. As described in the Complaint, HASSAN used the ride-sharing application Lyft to travel to and from his stash house and United States Post Offices in order to mail narcotics.  Members of the drug trafficking organization also placed a cellphone inside the jump starter in furtherance of the narcotics trafficking. Ex. 1 ¶ 14.

20.     Based on my training and experience and my familiarity with this and other drug trafficking investigations, I further know that individuals involved in drug trafficking also store information relating to their illegal activity and to persons involved with them in that activity on electronic devices like cellphones and computers. Such information can include, for example, logs of online "chats" with co-conspirators; text and email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging

and social medial accounts; financial information relating to accounts used to launder drug proceeds; photos of drugs; and/or records of illegal transactions. Individuals engaged in drug trafficking often store such records to, among other things, (i) keep track of co-conspirators' contact information; (ii) keep track of buyers' contact information; (iii) market to, and communicate with, potential customers over the Internet; (iv) keep a record of illegal transactions for future reference; and (v) keep an accounting of illegal drugs and proceeds for purposes of, among other things, dividing those drugs and proceeds with co-conspirators.

21.     Based on my training and experience, I also know that individuals engaged in drug trafficking may use their cellphones or computers to conduct Internet searches to further their drug trafficking. For example, I know that individuals involved in drug trafficking may conduct Internet searches related to locations used to transport, store, and distribute drugs, the purchase of drug paraphernalia (including drug packaging and storage materials), and how to evade detection by law enforcement. When using the Internet to purchase or sell drugs and drug paraphernalia, evidence of such transactions is typically sent to email accounts that may also be maintained on the trafficker's cellphone or computer.

22.     Electronic files or remnants of such files can be recovered months or even years after they have been created or saved on an electronic device such as smartphone or cellular telephone. Even when such files have been deleted, they can often be recovered, depending on how the electronic device has subsequently been used, months or years later with forensics tools. Thus, the ability to retrieve from information from the electronic device depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and habits.

23.     In addition to there being probable cause to believe that electronic devices will be found in the Subject Premises that contain evidence of the Subject Offenses, there is also probable

11

cause to believe that these electronic devices constitute instrumentalities of the Subject Offenses used to facilitate drug trafficking.

24.     Based on my training and experience, I know that narcotics traffickers who sells narcotics on the darkweb and those who maintain external hard drives in connection their narcotics trafficking often store those external hard drives in several premises, including storage lockers, such as the Subject Premises. In this case, external hard drives were found inside the Large Safe near narcotics proceeds.

25.     Based on the foregoing, I respectfully submit there is probable cause to believe that the Defendants are engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises.

## II.   Procedures for Searching ESI

### A.   Execution of Warrant for ESI

26.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on electronic devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because electronic data is particularly vulnerable to inadvertent or intentional modification or destruction, electronic devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and

specialized personnel and equipment potentially required to safely access the underlying electronic data.

- Fourth, many factors can complicate and prolong recovery of data from an electronic device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the device, which often take considerable time and resources for forensic personnel to detect and resolve.

### B. Review of ESI

27.     Following seizure of any electronic devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant that was created, accessed, modified, deleted, sent, or received between on or about September 1, 2017 and the date of the execution of the warrant.

28.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

### C. Return of ESI

29.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items. Data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offense.

## **CONCLUSION**

30.     Based on the foregoing, I respectfully request the court to issue a warrant to seize

the items and information specified in Attachments A and B to this affidavit and to the Search and

Seizure Warrant.


_____

JUSTIN KONG
Special Agent
Homeland Security Investigations


Sworn before me by reliable electronic means on this
 25  day of October, 2021

_____
HONORABLE CHERYL L. POLLAK
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# EXHIBIT 1
# COMPLAINT

Approved: _Rebecca Dell_____
          REBECCA T. DELL
          Assistant United States Attorney

Before:   HONORABLE KATHARINE H. PARKER
          United States Magistrate Judge
          Southern District of New York

------------------------------------x
                    :

UNITED STATES OF AMERICA    :    SEALED COMPLAINT
                    :
     - v. -            :    Violation of 21 U.S.C.
                    :    § 846
KAREEM HASSAN,           :
STEVEN HERRERA, and      :
WAEL HAMAD,            :    COUNTY OF OFFENSE:
                    :    NEW YORK
         Defendants.    :
                    :
------------------------------------x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JUSTIN KONG, being duly sworn, deposes and says that he is a Special Agent with Homeland Security Investigations ("HSI"), and charges as follows:

### COUNT ONE
### (Narcotics Conspiracy)

     1.    From at least in or around March 2021 to the present, in the Southern District of New York and elsewhere, KAREEM HASSAN, STEVEN HERRERA, and WAEL HAMAD, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

     2.    It was a part and an object of the conspiracy that KAREEM HASSAN, STEVEN HERRERA, and WAEL HAMAD, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

     3.    The controlled substance that KAREEM HASSAN, STEVEN HERRERA, and WAEL HAMAD, the defendants, conspired to distribute and possess with intent to distribute was mixtures and substances containing a detectable amount of cocaine, in violation of Title 21,

1

United States Code, Section 841(b)(1)(c).

(Title 21, United States Code, Section 846.)

The bases for my knowledge of the foregoing charge are, in part, as follows:

4.     I am a Special Agent with HSI, and I have been personally involved in the investigation of this matter.  This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.     Since in or about January 2021, HSI and the United States Postal Inspection Service ("USPIS") have been investigating several individuals who have been conspiring to sell cocaine on two marketplaces on the dark web ("Marketplace-1" and "Marketplace-2") and mail those orders at various post offices in the New York area.[1]  As described further below, KAREEM HASSAN, STEVEN HERRERA, and WAEL HAMAD, the defendants, are three individuals involved in the conspiracy.

**Residences Associated with KAREEM HASSAN, the Defendant**

6.     Based on my review of postal records and records from a service provider, I have learned the following, in substance and in part:

a.     An IP address ("IP Address-1") assigned to a particular apartment (the "Cherry Street Apartment") at Cherry Street in Manhattan, New York (the "Cherry Street Address") lists KAREEM HASSAN, the defendant, as the "Customer Name," the email

---

[1] Based on my training and experience, I know that the "dark web" is a colloquial name for a number of extensive, sophisticated, and widely used criminal marketplaces operating on the Internet, which allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet. These online black market websites use a variety of technologies to ensure that communications and transactions are shielded from interception and monitoring.

address kareem.hassan513@gmail.com as the customer's email address (the "Hassan Email Address"), and a particular phone number as the "Daytime Telephone" (the "Hassan Phone Number").

       b.   HASSAN has received mail at the Cherry Street Apartment.

       c.   As a result, I believe HASSAN resides at and/or has access to the Cherry Street Apartment.

       7.   Based on my review of postal records, my and other law enforcement agents' surveillance of a building located at 79th Street in Brooklyn, New York, and my review of records from an electricity provider, I have learned the following, in substance and in part:

       a.   KAREEM HASSAN, the defendant, has received packages and mail at a particular apartment (the "79th Street Apartment") in a building located at 79th Street in Brooklyn, New York (the "79th Street Address").

       b.   HASSAN pays the electricity for the 79th Street Apartment.

       c.   Based on the foregoing, I believe that HASSAN rents and/or has access to the 79th Street Apartment.

       8.   Based on my review of department of motor vehicle records, I have learned that KAREEM HASSAN, the defendant, lists a particular address on Senator Street in Brooklyn, New York (the "Senator Street Address") as his residence on his driver's license.

### March 23, 2021 Mailing and Identification of KAREEM HASSAN, the Defendant

       9.   Based on my participation in this investigation, my review of law enforcement records and reports, and my and other law enforcement agents' surveillance from on or about March 23, 2021, I have learned the following, in substance and in part:

       a.   On or about March 23, 2021, at approximately 12:08 PM, law enforcement agents observed the following: a male ("Male-1") wearing a camouflage jacket ("Jacket-1") exited an automobile operated by the rideshare Lyft ("Lyft-1") and entered a specific post office in Brooklyn, New York ("Post Office-1"). While inside Post Office-1, Male-1 mailed approximately seven parcels. After mailing the parcels, Male-1 exited Post Office-1 and reentered

Lyft-1.   After Male-1 left Post Office-1, law enforcement agents seized one of the seven parcels that Male-1 had mailed ("Parcel-1").   Pursuant to a judicially authorized search warrant, law enforcement agents opened Parcel-1, which contained a white powdery substance.   The white powdery substance inside Parcel-1 field tested positive for cocaine hydrochloride.

      b.   On or about March 23, 2021, at approximately 12:32 PM, law enforcement agents followed Lyft-1 to the Cherry Street Address and observed Male-1 exit Lyft-1 and enter the Cherry Street Address, which, as described above is an address where HASSAN appears to reside.

      c.   After Lyft-1 left the vicinity of the Cherry Street Address, law enforcement agents conducted a traffic stop of Lyft-1, and the driver of Lyft-1 stated that Male-1's Lyft username is "Hanglow."   Based on my understanding of the rideshare Lyft, I know that individuals use the Lyft application to book rides with a driver.   A user's account is assigned a particular username.

    10.   Based on my review of Lyft records, I have learned the following, in substance and in part:

      a.   On or about March 23, 2021, at approximately 12:05 PM, "Hanglow Dingus" was picked up from the 79th Street Address. The final destination of that Lyft ride was the Cherry Street Address.

      b.   The email address associated with the "Hanglow Dingus" account is the Hassan Email Address, and the phone number associated with the "Hanglow Dingus" account is the Hassan Phone Number.

      c.   Based on the foregoing, I believe Male-1 is HASSAN.

### The April 12, 2021 Undercover Purchase

    11.   Based on my participation in this investigation, my conversations with other law enforcement agents, and my review of screenshots from Marketplace-1, I have learned, in substance and in part, that, on or about April 12, 2021, an undercover law enforcement officer placed an online order for 1 gram of cocaine from Marketplace-1 ("UC Buy-1") and requested that the narcotics be sent to a particular address in Manhattan, New York ("Address-1").

12.  Based on my participation in this investigation, my
review of law enforcement records and reports, and my and other
law enforcement agents' surveillance from on or about April 13,
2021, I have learned the following, in substance and in part:

a.  On or about April 13, 2021, at approximately 9:45
AM, law enforcement agents observed KAREEM HASSAN, the defendant,
leave the Cherry Street Address, enter a Lyft ("Lyft-2"), travel
to the 79th Street Address, and enter the 79th Street Address.[2]

b.  At approximately 12:36 PM, law enforcement agents
observed HASSAN leave the 79th Street Address with a white plastic
trash bag ("Bag-1") and enter another Lyft ("Lyft-3").

c.  At approximately 12:38 PM, law enforcement agents
observed HASSAN exit Lyft-3 and enter Post Office-1 with Bag-1.

d.  At approximately 12:39 PM, law enforcement agents
observed HASSAN mail several United States Postal Service ("USPS")
flat rate envelopes that were inside Bag-1.  Subsequently, HASSAN
left Post Office-1 and reentered Lyft-3.

e.  After Hassan left Post Office-1, law enforcement
agents found that one of the flat rate envelopes that HASSAN had
mailed listed Address-1 (the address the undercover officer
provided) as the recipient address ("Parcel-2").  As a result,
Parcel-2 is believed to contain the contents of UC Buy-1.

f.  A white powdery substance was inside Parcel-2, and
it fielded tested positive for cocaine hydrochloride.

**The April 20, 2021 Package Seizure**

13.  Based on my participation in this investigation, my
review of law enforcement records and reports, and my and other
law enforcement agents' surveillance from on or about April 20,
2021, I have learned the following, in substance and in part:

---

[2] Law enforcement identified HASSAN during the course of this
surveillance based on (i) prior surveillance of HASSAN, some of
which is described above and review of his photo from the
Department of Motor Vehicles database; (ii) the fact that HASSAN
was again observed wearing Jacket-1; and (iii) the fact that HASSAN
was observed leaving the Cherry Street Address and entering the
79th Street Address—addresses associated with HASSAN as set out
above.

a.   At approximately 9:30 AM, law enforcement agents observed KAREEM HASSAN, the defendant, exit the Cherry Street Address, enter a Lyft ("Lyft-4"), travel to the 79th Street Address, and enter the 79th Street Address.

b.   At approximately 11:59 AM, law enforcement agents observed another male ("Male-2") exit a Lyft ("Lyft-5") and enter the 79th Street Address with a box ("Box-1").   Subsequently, Male-2 exited the 79th Street Address with empty mail parcels, and Male-2 was no longer carrying Box-1.   Male-2 placed the empty mail parcels in a recycling bin in front of the 79th Street Address and reentered Lyft-5.   After Male-2 left, law enforcement agents observed that all of the empty mail parcels listed HASSAN and the Cherry Street Apartment as the recipient's name and address.   Based on the foregoing, I believe that Male-2 met HASSAN inside the 79th Street Apartment.

c.   At approximately 2:38 PM, law enforcement agents observed Male-2 return in a Lyft ("Lyft-6") to the 79th Street Address, reenter the building, and exit with another box (the "Box-2").   Male-2 reentered Lyft-6 and traveled to another post office in Brooklyn, New York ("Post Office-2").   While inside Post Office-2, Male-2 mailed Box-2.

d.   The sender on Box-2 was STEVEN HERRERA, the defendant, and listed the Senator Street Address.[3]

e.   Pursuant to a judicially authorized search warrant, law enforcement agents opened Box-2.   Inside Box-2 there was a jump starter for a car.   Inside the jump starter was a custom-welded metal container that was also custom wired with a trigger mechanism to open a metal panel to expose the contents of the container.   Inside the metal container were (i) a padded silver mylar zipped bag that contained a cellphone ("Cellphone-1") that was not locked and a battery pack with a charging cable, and (ii) two padded envelopes.

f.   Pursuant to a judicially authorized search warrant, law enforcement agents searched Cellphone-1 and found, among other things, (i) photographs of HASSAN, (ii) a photograph of the driver's license of HERRERA, (iii) emails sent from storage units which included a bill for services for HERRERA, and (iv)

---

[3] The return address of "Senetor St." is believed to contain a typo and should be "Senator St."   There is no Senetor Street in Brooklyn, New York.

geolocation information that indicated that Cellphone-1 had been at the Cherry Street Address.

g.     Based on my training and experience, I know that narcotics traffickers often ship narcotics through the mail in covert packaging, and, after receiving the narcotics, narcotics traffickers ship back the covert packaging.  When returning the covert packaging, narcotics traffickers often include a cellphone so that the narcotics traffickers can track the location of the shipment.

h.     Based on the foregoing, I believe that Box-2 was shipped in furtherance of the conspiracy.

### The April 28, 2021 Undercover Purchase

14.  Based on my participation in this investigation, my conversations with other law enforcement agents, and my review of screenshots from Marketplace-1, I have learned, in substance and in part, that, on or about April 28, 2021, an undercover law enforcement officer ordered online 1 gram of cocaine from Marketplace-1 ("UC Buy-2"), and requested that the narcotics be sent to a particular address ("Address-2").

15.  Based on my conversations with employees of Post Office-1 and other law enforcement agents, my surveillance of KAREEM HASSAN, the defendant, and my review of records from Lyft, I have learned the following, in substance and in part:

a.     On or about May 4, 2021, at approximately at 3:30 PM, law enforcement agents were contacted by employees of Post Office-1 and informed that a male matching the description of HASSAN and wearing a camouflage jacket entered Post Office-1 and mailed several parcels.

b.     Also on or about May 4, 2021, at approximately 4:05 PM, I and other law enforcement agents observed HASSAN wearing a camouflage jacket and enter the Cherry Street Address.[4]

c.     On or about May 7, 2021, law enforcement agents seized one of the parcels HASSAN mailed on May 4, 2021 ("Parcel-3").  Parcel-3 was addressed to Address-2 (the address provided by the undercover officer) and believed to contain UC Buy-2.

_____

[4] Based on my review of records from Lyft, I know, that at approximately 4:08 PM, HASSAN returned to the Cherry Street Address in a Lyft.

d.   A white powdery substance was inside Parcel-3, and it field tested positive for cocaine hydrochloride.

## The July 12, 2021 Undercover Purchase & Identification of STEVEN HERRERA, the Defendant

16.   Based on my participation in this investigation, my conversations with other law enforcement agents, and my review of screenshots from Marketplace-2, I have learned, in substance and in part, that, on or about July 12, 2021, an undercover law enforcement officer ordered online 1 gram of cocaine from Marketplace-2 ("UC Buy-3"), and requested that the narcotics be sent to Address-1.

17.   Based on my participation in this investigation, my review of law enforcement records and reports, my review of surveillance footage, and my conversations with law enforcement agents and witnesses and employees of a post office in New York, New York ("Post Office-3"), I have learned the following, in substance and in part:

a.   On or about July 13, 2021, at approximately 12:30 PM, an employee of Post Office-3 stated, in substance and in part, that an unknown male had just mailed several flat-rate envelopes matching the description of parcels previously mailed by KAREEM HASSAN, the defendant.  One of the envelopes mailed by the unknown male ("Parcel-4") was addressed to Address-1 (the address provided by the undercover officer).  As a result, Parcel-4 is believed to contain the contents of UC Buy-3.

b.   Based on my review of surveillance footage from a store ("Store-1") near Post Office-3, I observed that, on July 13, 2021, at approximately 12:17 PM,[5] a male ("Male-3") entered Post Office-3 with a white plastic bag ("Bag-2") containing flat-rate envelopes and subsequently exited Post Office-3 without Bag-2.

c.   Based on my review of surveillance footage from the Cherry Street Address, I have learned the following, in substance and in part: On or about July 13, 2021, at approximately 11:25 AM, an individual wearing the same clothes as Male-3—and, therefore, believed to be Male-3—arrived at the Cherry Street Address, took

---

[5] The time reflected on the surveillance footage is approximately 12:06 PM.  However, based on my conversations with an employee at Store-1, I have learned that the surveillance footage timestamp was approximately 11 minutes slow.

an elevator up to the floor where the Cherry Street Apartment is located, and subsequently exited the Cherry Street Address with Bag-2. At approximately 12:09 PM, Male-3 exited the Cherry Street Address. Based on the foregoing as well as the timing of the mailing at Post Office-3, I believe that Male-3 entered the Cherry Street Apartment before mailing Parcel-4 at Post Office-3.

d. Based on my review of records from the Cherry Street Address and my conversations with employees from the Cherry Street Address, I have learned, in substance and in part, that (i) STEVEN HERRERA, the defendant, has been given access to the Cherry Street Apartment by the tenants of the Cherry Street Apartment, and, (ii) when HERRERA was given access, HERRERA had to provide his driver's license.

e. Based on the foregoing and my comparison of (i) a picture of HERRERA from his driver's license, and (ii) the surveillance footage of Male-3 from Store-1 and the Cherry Street Address from July 13, 2021, I believe that Male-3 is HERRERA.

f. Based on the foregoing, I believe that, on or about July 13, 2021, HERRERA visited the Cherry Street Apartment and subsequently mailed Parcel-4 at Post Office-3.

g. A white powdery substance was inside Parcel-4, and it field tested for cocaine hydrochloride.

### The July 23, 2021 Seizure

18. Based on my participation in this investigation, my review of law enforcement records and reports, my review of surveillance footage from the Cherry Street Address and from a post office in New York, New York ("Post Office-4"), and my conversations with law enforcement agents and employees of Post Office-4, I have learned the following, in substance and in part:

a. On or about July 23, 2021, at approximately 11:06 AM, a male ("Male-4") entered an elevator on the same floor as the Cherry Street Apartment. Male-4 was wearing a black hat (the "Black Hat"), black t-shirt, and khaki shorts, and Male-4 was carrying two white garbage bags.

b. On or about July 23, 2021, at approximately 11:11 AM, Male-4 entered Post Office-4 with the two white garbage bags. While inside Post Office-4, Male-4 gave the two white garbage bags to a postal employee to mail.

     c.   After Male-4 left Post Office-4, law enforcement agents seized one parcel that Male-4 had mailed ("Parcel-5"). Pursuant to a judicially authorized search warrant, law enforcement agents opened Parcel-5, which contained 20 white pills marked with "M367." The pills were field tested, and the field test did not identify the presence of any controlled substance. The pills have been sent to a laboratory for further testing.

## The September 24, 2021 Seizure & Identification of WAEL HAMAD, the Defendant

    19.   Based on my participation in this investigation, my review of law enforcement records and reports, my review of surveillance footage from the Cherry Street Address and from Post Office-4, and my conversations with law enforcement agents and employees of Post Office-4, I have learned the following, in substance and in part:

     a.   On or about September 24, 2021, at approximately 11:11 AM, a male wearing the same clothes, including the Black Hat, as Male-4 on July 23, 2021 and, therefore, believed to be Male-4, entered an elevator on the same floor as the Cherry Street Apartment. Male-4 was once again carrying two white garbage bags.

     b.   On or about July 23, 2021, at approximately 11:18 AM, Male-4 entered Post Office-4 with the two white garbage bags. While inside Post Office-4, Male-4 gave the two white garbage bags to a postal employee to mail.

     c.   After Male-4 left Post Office-4, law enforcement agents seized four parcels that Male-4 had mailed. Pursuant to a judicially authorized search warrant, law enforcement agents opened each parcel. Two parcels contained a white powdery substance weighing, in total, approximately 4.5 grams. The substance field tested positive for cocaine hydrochloride. One parcel contained pills, and the last parcel contained an unknown liquid.

    20.   Based on my review of postal records, I know that KAREEM HASSAN, the defendant, has an account which allows him to purchase stamps online and on the phone. Between March 2021 and July 2021, HASSAN has purchased approximately 2,008 stamps. Based on my training and experience and my participation in this investigation, I believe that HASSAN is purchasing stamps to mail narcotics. Based on my discussions with a postal employee, I have

learned that WAEL HAMAD, the defendant, and another individual have access to HASSAN's postal account.

21.   Based on my review of records from the Cherry Street Address, I know that KAREEM HASSAN and WAEL HAMAD, the defendants, are on the lease to the Cherry Street Apartment.

22.   Based on my review of surveillance footage of WAEL HAMAD, the defendant, that was obtained during a routine customs baggage inspection of HAMAD's belongings at Newark Liberty International Airport on or about May 2, 2021, I observed that HAMAD was wearing a hat similar to the Black Hat worn by Male-4 on July 23, 2021 and September 24, 2021.

23.   Based on the foregoing, including (i) the fact that WAEL HAMAD, the defendant, appears to be wearing the Black Hat that Male-4 wore on July 23, 2021 and September 24, 2021 and (ii) the fact that HAMAD is on the lease to the Cherry Street Apartment and Male-4 is seen entering an elevator on the same floor as the Cherry Street Apartment on July 23, 2021 and September 24, 2021, I believe that Male-4 is HAMAD.

WHEREFORE, I respectfully request that warrants be issued for the arrests of KAREEM HASSAN, STEVEN HERRERA, and WAEL HAMAD, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

JUSTIN KONG
Special Agent
Homeland Security Investigations

Sworn before me on this
5 day of October, 2021

THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11

## ATTACHMENT A

*Premises to be searched*

The Subject Premises is particularly described as Unit #523 at Park Circle Storage, 348 Coney Island Avenue, Brooklyn, NY 11238. The Subject Premises is located inside a five-story building ("Building-1") on Coney Island Avenue between Caton Place and Kermit Place, bearing a green sign with white lettering that states, among other things, "Park Circle Storage." The Subject Premises is located inside Building-1 behind a grey corrugated metal door (the "Entrance"). The number "523" appears in black font above the Entrance. A photograph of the Entrance to the Subject Premises appears below.



## ATTACHMENT B

*Items to be seized*

The items to be seized from the Subject Premises consists of the following evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances and controlled substance analogues) and Title 18, United States Code, Section 924(c) (firearms use) (the "Subject Offenses") described as follows:

1.      Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys;

2.      Evidence concerning the purchase, sale, ownership, or possession of illegal drugs, including without limitation, drugs, drug paraphernalia such as scales, packaging, bubble wrap, pill bottles, labels, and small plastic bags, and books, records, receipts, correspondence, communications, notes, ledgers, photographs, and other papers or documents associated with the purchase or sale of illegal drugs;

3.      Evidence concerning the creation and operation of websites involved in marketing and selling illegal drugs, including without limitation, books, records, receipts, correspondence, communications, notes, ledgers, photographs, and other papers or documents associated with the creation and operation of websites involved in marketing and selling illegal drugs and the registration of and payment for domains and other internet infrastructure for such websites;

4.      Proceeds from the illegal sale of drugs, including United States currency and cryptocurrency, precious metals, jewelry, watches, and financial instruments, including money orders, certificates of deposit, and stocks and bonds, and other items expensive property;

5.      Evidence concerning the identity or location of, and communications with, co-conspirators and/or individuals involved in marketing, purchasing, selling, transporting, or storing illegal drugs;

6.      Evidence concerning the location of illegal drugs and drugs proceeds, including Internet searches and browsing history related to the Subject Offenses;

7.      Evidence, including documents, spreadsheets, and ledgers, identifying and/or tracking co-conspirators, drugs, drugs proceeds, drug customers, and accounts used to receive, transfer, or launder drugs proceeds;

8.      Bank records, checks, credit card bills, account information, and other financial records relating to the Subject Offenses;

9.      Any safes, key-lock strong boxes, suitcases, containers, traps, and other boxes or instruments secured by combination and/or key locks of various kinds that may contain the items described above;

3

10.     Firearms, ammunition, and other weapons, and any other evidence of the possession or ownership of firearms, ammunition, and other weapons; and

11.     Evidence concerning any online accounts or any electronic devices where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

**A.   Search and Seizure of Electronically Stored Information**

The items to be seized from the Subject Premises also include any electronic devices, storage media, and hard wallets that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smartphones, digital cameras, and scanners. In lieu of seizing any such electronic devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from the Subject Premises are:

1.     Any items or records needed to access the data stored on any seized or copied electronic devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.     Any items or records that may facilitate a forensic examination of the electronic devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied electronic devices or storage media.

3.     Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied electronic devices or storage media.

**B.   Review of ESI**

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant that was created, accessed, modified, deleted, sent, or received between September 1, 2017 and the date of the execution of the warrant.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

4